PEARCE *v.* WILLIAMSON & CALDWELL.

4-8339                                    206 S. W. 2d 8

Opinion delivered December 1, 1947.

*J. F. Williamson,* for appellant.

*B. J. Semmes,* for appellee.

GRIFFIN SMITH, Chief Justice.    Mrs. M. C. Pearce sued Mrs. Isabelle Williamson and R. A. Caldwell as partners, alleging that a house they moved from land owned by the plaintiff was worth $500. The appeal is from judgment on a jury's verdict in favor of the defendants.

The partnership as such farmed lands belonging to Mrs. Pearce, starting in 1935. In April 1941 a small portable sawmill, in charge of Caldwell, was by agreement with Mrs. Pearce moved to a predetermined site on the rented land for use in converting certain logs into lumber. Williamson & Caldwell collected $905 from Mrs. Pearce for clearing land from which the logs were taken. Seemingly the sawmill was utilized as an incidental means of salvaging value of the usable timber. The record does not show to what extent Mrs. Pearce shared in production of the mill, or when it was delivered, although ad-

mittedly she received some of the lumber. Caldwell testified that his agreement with Mrs. Pearce before moving the mill was not in regard to cutting timber, but in connection with clearing the land.

After the mill had been located a small tenant house near it was used by a night watchman. Mrs. Pearce testified the building was placed there by her husband, who later died. Mrs. Williamson and Mr. Caldwell each testified that the house was formerly on Mrs. Williamson's land and was loaned to the partnership for temporary use. This is the building about which the controversy arose and for which Mrs. Pearce asks pay.

October 31, 1941, Williamson & Caldwell leased from Mrs. Pearce, for a period of five years from January 1, 1942, the fractional northwest quarter of section seven, etc. It embraced the farming lands formerly cultivated by the partners, and included the millsite. At the end of the term, but shortly before possession was surrendered, the house was taken on direction of Caldwell to premises owned by Mrs. Williamson.

A lease as originally worded by a lawyer representing Mrs. Pearce was objectionable to Caldwell, who in turn had his attorney prepare the document finally executed. It contains a covenant that the lessees will keep all improvements in good condition, usual wear and tear excepted, and will vacate the premises upon termination of their rights.

On conflicting evidence regarding when, how, and from where the house was moved, its construction, cost of replacement, purpose for which used, etc., the jury found against Mrs. Pearce. Her contention is that as a matter of law the house became a part of the realty, in the absence of an agreement, express or implied, that it was to be moved to her land and used temporarily to facilitate sawmill work. By her assertion that the house was built by her husband Mrs. Pearce definitely contradicted all of the testimony given by witnesses for the defendants tending to show that the building came through Mrs. Williamson. If, therefore, the case turned

upon this question of fact the jury's verdict would be conclusive. But the issue does not rest upon such an accessible basis; nor can it be said that there was probative substance, evidencing waiver, in Caldwell's testimony that after the house was put on the property Mrs. Pearce asked where it came from, and was told by Caldwell that he borrowed it from Mrs. Williamson, and "it will have to be put back when I get through." Caldwell did not say that Mrs. Pearce assented to his intent. If this conversation had occurred before the house was moved and Mrs. Pearce had then remained silent, consent might be implied. At the time Caldwell spoke, however, he had acted upon his own responsibility, assuming there would be no objection.

When the mill was moved from the Pearce lease late in 1941 or early in 1942, the house remained undisturbed until the close of 1946. In the meantime it was not used in connection with agricultural activities. For a short period a fisherman occupied it, but seemingly without consent. The house was built on "six by eights," and when placed on Mrs. Pearce's land there was no additional foundation or substructure, hence no change indicating permanency or want of it.

Assuming that Caldwell's intention was that the house would be returned to Mrs. Williamson, still the two as lessees—months after the building had been placed on location—executed their new contract and dealt with the property as it existed October 31, 1941. The contract was written at Caldwell's instance, and he did not see fit to mention the house. Later Mrs. Pearce insured for $250 —including the buildings with five other tenant houses separately numbered.

Appellant thinks the applicable law is declared in *Sanitary District of Chicago* v. *Cook,* 169 Ill. 184, 48 N. E. 461, 39 L. R. A. 369, 61 Am. St. Rep. 161. It was there said that the great weight of authority was to the effect that where at the expiration of a lease during which trade fixtures are erected by a tenant, and subsequently a new lease is taken without reserving the right of removal, such fixtures cannot be removed at ex-

piration of the second lease. The reason, says the opinion, is that at the time the last lease is given, fixtures in place are part of the thing demised, and a tenant in accepting such lease without reserving property he might formerly have been entitled to has acknowledged the landlord's right. The decision, rendered in 1897, was subsequently referred to as the Illinois rule. It recognizes an absence of uniform application and points to a criticism by Judge COOLEY written nearly ten years earlier. *Kerr* v. *Kingsbury,* 39 Mich. 150, 33 Am. Rep. 362.

In *Springs* v. *Atlantic Refining Co.,* (North Carolina) 205 N. C. 444, 171 S. E. 635, 110 A. L. R. 474, it is pointed out that the liberality extended to a tenant to remove improvements made by him may not apply as between vendor and vendee, or mortgagor and mortgagee. It was then said that the apparent majority holding supports the proposition that where, at the expiration of a lease during which trade fixtures have been erected by the tenant, a new lease of the same premises is taken, containing no reservation of any right or claim of the tenant to the fixtures placed during the first lease, such fixtures are not removable by the tenant during or at the expiration of the second lease, notwithstanding his continuous possession of the premises. The case is annotated in 110 A. L. R., p. 480, and discussed as the "forfeiture" and the "non-forfeiture" rule, with Michigan cases speaking for the latter.

The tendency to hold as a matter of law that execution of a new contract without reservations estops the tenant from asserting a claim he formerly had, has in recent years given way in many jurisdictions to a milder policy more in conformity with the so-called non-forfeiture rule; and this is particularly true where, in view of essential facts relating to the time, manner, and use of the fixture, it can be said that it was reasonably necessary to practical operations under the lease, and where no substantial injury can result to the landlord.

None of our cases has decided the exact point in question and we do not appear to have adopted the forfeiture or the non-forfeiture rule; nor do we now approve either

to the extent of holding that where a second lease is taken without interruption of tenancy the single factor of silence in respect of a building would be conclusive of the claim that it was or was not subject to removal. But we do hold that in placing the house at the millsite (assuming that it came from the Williamson farm) without consulting Mrs. Pearce, and in failing to remove it within a reasonable time after the mill had served its purpose, Caldwell justified the belief that there was no expectation of claiming it. In consequence Mrs. Pearce treated the house as her own, causing it to be insured, and paying premiums. Whatever rights the lessees may have had were so effectively disregarded that abandonment was fairly inferable, and when Mrs. Pearce, acting upon assumption that her possession would not be questioned, caused the house to be insured under an assertion of ownership, that status cannot now be questioned by those who created it.

One witness testified that the house was worth $60 or $75 and Caldwell said it was worth $100 to $125. One who had inspected it for the purpose of giving testimony thought the lumber alone would cost $98, to which labor would have to be added if the building should be replaced. It was approximately twenty-four years old—built, as some said, of cypress. West Memphis Lumber Company gave Mrs. Pearce a replacement estimate of $978 on plans she presented. Mrs. Pearce thought the old house was worth from $500 to $700.

Under the Court's instructions the jury was permitted to find that Mrs. Pearce had no valid claim; hence damages were not properly considered. The judgment is reversed and the cause is remanded with directions to try this issue alone.